**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

**Case No.**

**SECURITIES AND EXCHANGE COMMISSION,**

Plaintiff,

**v.**

**ADVISOR WECHAT CAPITAL,**
**TECH BROKERAGE ASSET ALLIANCE LTD.,**
**HB WEALTH ADVISORS,**
**IDEACRYPTO EXCHANGE LLC,**
**CONVERGENT WEALTH ADVISORS INC.,**
**REALSIMPLE CRYPTO EXCHANGE INC.,**
**ASSOCIATED WEALTH ADVISORS LTD.,**
**ESSENTIAL CRYPTO EXCHANGE,**

Defendants.

---

**COMPLAINT AND JURY TRIAL DEMAND**

---

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission"), for its Complaint against Advisor WeChat Capital ("WeChat"), Tech Brokerage Asset Alliance Ltd. ("TBAA"), HB Wealth Advisors ("HB Wealth"), IdeaCrypto Exchange LLC ("IdeaCrypto"), Convergent Wealth Advisors Inc. ("Convergent Wealth"), RealSimple Crypto Exchange Inc. ("RealSimple"), Associated Wealth Advisors Ltd. ("Associated Wealth"), Essential Crypto Exchange ("Essential Crypto"), (collectively "Defendants"), alleges as follows:

## <u>SUMMARY OF ALLEGATIONS</u>

1. Beginning by at least August 2024, eight Colorado-based entities defrauded more than 1,500 United States investors out of at least $37 million through an integrated investment

scheme that lured investors into the clutches of purported investment advisers through social media advertisements and other internet devices. The investment advisers coaxed investors into selling and investing assets, including stocks, 401(k) holdings, retirement assets, and real property, to purchase purported crypto assets on purported crypto asset trading platforms. The investment advisers and related entities then stole their money.

2. The defendants worked in pairs. Four defendants - WeChat, HB Wealth, Convergent Wealth, and Associated Wealth (collectively, "the Adviser Defendants") – held themselves out as investment advisers. The Adviser Defendants recruited and acquired investor clients primarily through social media advertising. When a prospective investor clicked on a social media advertisement, it directed them to one of a number of WhatsApp chats. In these WhatsApp chats, as well as in press releases and on their web sites, the respective Adviser Defendants claimed expertise in the business of providing personalized investment advice to clients. Virtually everything the Adviser Defendants represented about themselves and their expertise was a lie, and those material misstatements powered the scheme.

3. Both in direct chats with investors, and through information on their websites, the Adviser Defendants endeavored to secure the confidence of their investor clients by, among other things, falsely touting their expertise in the stock market. The Adviser Defendants then made recommendations for investors to purchase and sell stocks, as well as other assets, in order to eventually lure them to purchase what would turn out to be fake crypto assets in what the Adviser Defendants called Initial Exchange Offerings or "IEOs." The Adviser Defendants represented to investors that crypto investment offerings were more profitable than other investments. Virtually everything the Adviser Defendants represented and recommended about the proposed crypto investments was a lie.

4. The Adviser Defendants advised and encouraged their clients to purchase and sell crypto assets via the crypto asset trading platform with which they were paired: WeChat paired with TBAA; HB Wealth paired with IdeaCrypto; Convergent Wealth paired with RealSimple; and Associated Wealth paired with Essential Crypto (collectively, the "Crypto Asset Trading Platform Defendants").

5. Each of the adviser/platform pairs operated for approximately six months: WeChat and TBAA from approximately August to December 2024; HB Wealth and IdeaCrypto from approximately January to July 2025; Convergent Wealth and RealSimple from approximately July to December 2025; and Associated Wealth and Essential Crypto from approximately January to May 2026. During the six-month segments the respective adviser/platform pairs lured sometimes hundreds of investors, succeeded in recommending millions of dollars in investments - mostly in fake crypto assets - misappropriated millions of dollars of investor money, then essentially disappeared. With the abandonment and disappearance of one adviser/platform pair, a succeeding one appeared and the theft of investor money began anew.

6. To further the scheme Convergent Wealth and Essential Crypto made false statements in Forms ADV filed with the Commission and made false statements in their filings, including: (1) claiming they were exempt from registration as an investment adviser because they acted solely as an adviser to private funds, which they did not; (2) listing regulatory contacts who do not appear to be real people and phone numbers for the firms and those contacts that were disconnected; and (3) claiming to have offices in Colorado, when they did not, and listing false addresses for those claimed offices.

7. While Defendants are United States corporate entities or, in one instance, an unincorporated association located in the United States, those entities and the scheme were operated

by individuals most likely located abroad.

8. By engaging in the conduct described in this Complaint, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; also, the Adviser Defendants have violated Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1) and (2)]; and defendants Convergent Wealth and Essential Crypto have violated Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action under enforcement authority conferred by Sections 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e) and 80b-14].

10. The Commission seeks a final judgment: (a) permanently enjoining the Defendants from violating the federal securities laws this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5) and (7)]; (c) ordering Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, for the Adviser Defendants, Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; (d) for the Adviser Defendants, an injunction specifically enjoining them from, directly or indirectly, acting as or being associated with any investment adviser; (e) for defendants Convergent Wealth and Essential Crypto, an injunction specifically enjoining them and their officers, agents, servants, employees, and attorneys, from filing a Form ADV as an exempt reporting adviser ("ERA"); and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action under Sections 21(d), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14], and 28 U.S.C. § 1331. As to certain of the acts, practices, transactions, and courses of business constituting the violations, Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, and/or of the facilities of national securities exchanges.

12. Venue is proper in the District of Colorado under Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. Specifically, each Defendant was incorporated in Colorado and/or represented in internet communications that it transacted business in the District of Colorado.

## DEFENDANTS

13. **Advisor WeChat Capital ("WeChat")** incorporated in Colorado on September 3, 2020, under a different name - Benchmarking the Ethereum Foundation - then changed its name to Advisor WeChat Capital in a filing on June 18, 2024. The Colorado Secretary of State currently lists WeChat as "Delinquent" for failure to file an annual report. WeChat twice previously incurred, then cured, such a delinquency, most recently on June 18, 2024, by filing a statement of correction that listed what appear to have been a fake address and fake registered agent.

14. **Tech Brokerage Asset Alliance Ltd. ("TBAA")** incorporated in Colorado on August 10, 2020, under a different name - New Discovery 7 Rules Foundation - before changing its name to Tech Brokerage Asset Alliance Ltd. in a filing on June 18, 2024, the same day that WeChat changed to its current name. The Colorado Secretary of State currently lists TBAA as "Delinquent" for failure to file an annual report, though TBAA previously incurred, then cured, such a

delinquency, the same day WeChat did on June 18, 2024, by filing a statement of correction. TBAA is the fake crypto asset trading platform to which WeChat directed investors. On June 22, 2024, TBAA registered with the Financial Crimes Enforcement Network (FinCEN) as a Money Service Business ("MSB"). On July 27, 2024, TBAA filed a Form D with the Commission, and representatives of WeChat later falsely claimed the filing as evidence that TBAA was "registered" with the SEC.

15. **HB Wealth Advisors ("HB Wealth")** is an unincorporated association. On the HB Wealth website, since taken down, the company at least as of March 11, 2025, listed an address in Denver as its place of business.

16. **IdeaCrypto Exchange LLC ("IdeaCrypto")** incorporated in Colorado on November 22, 2024. The Colorado Secretary of State currently lists IdeaCrypto as "Delinquent" for failure to file an annual report. On November 21, 2024, IdeaCrypto registered with FinCEN as an MSB. IdeaCrypto is the fake crypto asset trading platform to which HB Wealth directed investors.

17. **Convergent Wealth Advisors Inc. ("Convergent Wealth")** incorporated in Colorado on April 28, 2025. The Colorado Secretary of State currently lists Convergent Wealth as "Delinquent" for failure to file an annual report. On May 8, 2025, Convergent Wealth filed a Form ADV with the SEC claiming to be an ERA.

18. **RealSimple Crypto Exchange Inc. ("RealSimple")** incorporated in Colorado on April 28, 2025, and the same day registered with FinCEN as an MSB. The Colorado Secretary of State currently lists RealSimple as "Delinquent" for failure to file an annual report. RealSimple is the fake crypto asset trading platform to which Convergent Wealth directed investors.

19. **Associated Wealth Advisors ("Associated Wealth")** incorporated in Colorado on October 8, 2021, under a different name - Winex LTD - then as Leefire Limited on April 8, 2022,

before changing its name to Associated Wealth on October 9, 2025. The Colorado Secretary of State currently lists Associated Wealth as in Good Standing.

20. **Essential Crypto Exchange ("Essential Crypto")** incorporated in Colorado on May 20, 2020, as America Mobile Global Valuable Blockchain Technology Research Foundation, then on August 24, 2025, changed its name to Ssential Crypto Exchange, before changing its name again to Essential Crypto Exchange on August 31, 2025. The Colorado Secretary of State lists Essential Crypto as Noncompliant as of November 1, 2026, after not filing an annual report due on Oct. 31. Essential Crypto is the fake crypto asset trading platform to which Associated Wealth directed investors. On October 9, 2025, Essential Crypto registered with FinCEN as an MSB. On September 26, 2025, Essential Crypto filed a Form ADV with the SEC claiming to be an ERA.

## RELATED PARTIES

21. Each of the Defendants at various times listed one or more individuals on incorporation or other documents, and/or on their websites, identifying them as having an affiliation with the entity. The same or sometimes different names were used to take other acts in furtherance of the scheme, including filing forms with the SEC and FinCEN in Defendants' names, and to register domain names for Defendants' websites. Those names and individuals are believed to be fictitious for several reasons including: they could not be identified through searches of public records, they could not be found at addresses listed for them, and phone numbers listed for them routinely were disconnected.

22. While Defendants are U.S. corporate entities the scheme involved individuals located abroad, as Internet Protocol addresses associated with various acts taken in furtherance of the scheme identify those actions being taken from outside the United States.

## FACTUAL ALLEGATIONS

### A. The Adviser Defendants Used Social Media Advertisements to Lure Investors.

23. The Adviser Defendants placed advertisements on social media that touted their investing acumen and successes and were designed to lure prospective investors to click on a link in the advertisement. These advertising blitzes by the Adviser Defendants focused on successive six-month segments: WeChat, approximately August to December 2024; HB Wealth, approximately January to July 2025; Convergent Wealth, approximately July to December 2025; and Associated Wealth, approximately January to May 2026. After clicking the link in the advertisements, prospective investors were directed to different WhatsApp chats.

24. Each six-month segment of the scheme, with a different Adviser Defendant as the lure, worked almost exactly the same. The Adviser Defendant whose six-month turn was up solicited and lured prospective investors through social media advertisements. They then provided investment advice to any investor who took the bait, first to buy and sell U.S. stocks and other assets, and subsequently to buy and sell purported crypto assets on a purported crypto asset trading platform run by the Crypto Asset Trading Platform Defendant with which they were paired. Once the adviser and trading platform operated together in this way for about six months, and successfully misappropriated millions of dollars in investor money, one adviser-platform pair disappeared and an identical process began, simply using a new adviser paired with a new trading platform.

25. Connecting with prospective investors through WhatsApp chats enabled the Adviser Defendants to communicate directly with prospective and confirmed investors, including directing them to press releases and to their respective web sites. In direct communications, in press releases, and on their websites, each Adviser Defendant held itself out as having expertise and being in the business of providing personalized investment advice to clients. The former representations were

false; the latter had an element of technical accuracy because investors did receive "advice," but were otherwise false and misleading because they did not disclose that the ultimate purpose of the advice was to steal investor money.

26. The WeChat website that was operational and available from approximately August to December 2024 stated: "Founded in 2016, Advisor WeChat Capital is a financial advisory firm dedicated to diversified investments" and that the company "provid[es] client centric investment solutions that were customized to an investor's specific goals."

27. The HB Wealth web site that was operational and available from approximately January to July 2025 described the company as "a professional investment advisory firm established in 2016, dedicated to helping clients achieve financial independence" and touted the same goals to provide services tailored to individual clients.

28. A press release for Convergent Wealth made available to investors from approximately July to December 2025 described the firm as "a premier investment advisory firm," and the company's web site stated, "At Convergent Wealth Advisors, you'll enjoy personal service and customized solutions . . . "

**B. The Adviser Defendants Acted as Investment Advisers.**

29. In separate WhatsApp chats with investors for Associated Wealth, one purported representative described himself as "your dedicated investment adviser" and another stated, "Leveraging the expertise of our mentor team, I will provide one-on-one market analysis and tailored advice from a professional investment advisor perspective . . . "

30. Consistently across the discreet segments of the scheme, individuals purportedly associated with the respective Adviser Defendants were touted as "top fund managers." The supposed fund managers are believed to be fictitious for several reasons including: they could not

be identified through searches of public records, they could not be found at addresses listed for them, and phone numbers listed for them routinely were disconnected.

31. Investors also were led to believe they were getting one-on-one advice from one of these top fund managers through private WhatsApp chats. For WeChat, the human advisers were identified as Spencer Brown and Logan Streick. For HB Wealth, they were Jonathan Reed and Kevin Wright. For Convergent Wealth, they were Robin Mitchell and Jason Tanner. And, for Associated Wealth, they were Mark Thomas and William Jones. Those names and individuals are believed to be fictitious for several reasons including: they could not be identified through searches of public records, they could not be found at addresses listed for them, and phone numbers listed for them routinely were disconnected.

32. The Adviser Defendants gave investment advice directly to investors, representing to investors that they were communicating with a real person in WhatsApp chats. The course of the advice followed a familiar pattern. Initially, the advice from the Adviser Defendants was for the client to buy and sell U.S. listed stocks in the client's own account. For example:

- On or about October 6, 2024, Spencer Brown (a purported adviser at WeChat) stated to an investor: "[A]fter the stock market opens tomorrow, I suggest you send me the stocks you currently hold, and I will give you some suggestions." The WhatsApp chat continued with the investor confirming that he/she had moved money. A typical next step was for the adviser to recommend that the investor sell stocks (as well as other assets), and to buy crypto assets recommended by the adviser.
- On or about March 16, 2025, Jonathan Reed (a purported adviser at HB Wealth) stated to an investor in a WhatsApp chat: "You can contact Nora Blake [Reed's purported assistant] to sign up according to your personal investment situation!"

The WhatsApp chat continued with the adviser walking the investor through specific trades in crypto assets.

- On or about July 30, 2025, Ava Hamilton (a purported adviser at Convergent Wealth) stated to an investor: "[Y]ou can send me your holdings, and I can help analyze your stocks to see how they're performing right now, whether any adjustments are needed, or provide some other recommendations." The extended WhatsApp chat with the adviser resulted in the investor purchasing a stock recommended by the adviser, sending the adviser a screenshot of his/her investment holdings, and ultimately purchasing crypto assets recommended by the adviser.
- On or about November 18, 2025, Robert Williams (a purported adviser at Associated Wealth) stated to an investor: "This is a quality stock recommended by Coach Mark, If you think it looks good too, I'd suggest buying a small amount." In the extended WhatsApp chat with the adviser the investor confirmed buying the stock recommended by the adviser. The adviser then showed the investor how to create a crypto address to receive crypto assets she supposedly "won" in a lottery and then use that address to buy more crypto assets recommended by the adviser.

33. The respective Adviser Defendants also advised investors to buy crypto assets purportedly sold by their paired Crypto Asset Trading Platform Defendant, providing advice both directly and indirectly.

34. A critical aspect of the scheme, carried out by each of the Adviser Defendants during the segment of the scheme during which they operated, entailed shifting their advice to investors from buying and selling stocks, to purchasing crypto assets; specifically, crypto assets purportedly offered by their paired Crypto Asset Trading Platform Defendants.

35. Once successful in luring an investor into its investment adviser web, and having secured their confidence, the Adviser Defendants systematically advised and assisted investors to buy what turned out to be fake crypto assets, often in what the respective Adviser Defendants called an Initial Exchange Offering or "IEO." The pitches by the respective Adviser Defendants were essentially carbon copies of each other. Each Adviser Defendant touted their expertise in the stock markets and their belief that the crypto offerings were a more profitable investment for investors. Each Adviser Defendant compared the IEO to an initial public offering (IPO) but advised investors that IEOs were more profitable. For example, a representative of Associated Wealth wrote in a WhatsApp chat with an investor, "IPO (Initial Public Offering) is a company's first public share issuance via stock exchange; IEO (Initial Exchange Offering) is a token sale via crypto exchange, with exchange vetting and technical support . . . IEOs offer lower entry barriers, higher growth potential . . . IPOs less accessible, smaller profits for retail investors."

36. Each Adviser Defendant consistently advised investors to sell stocks and buy the crypto assets purportedly sold by their paired Crypto Asset Trading Platform Defendants, both through IEOs and otherwise. For example:

- On or about November 14, 2024, Logan Streick (a purported adviser at WeChat) to an investor: "I've been advising everyone to reduce their stock positions . . . [H]ere's a recommendation from Spencer [Brown] and me: it's time to take action. Sell [specific named stocks] and put those funds into [TBAA]'s IEO."
- On or about February 20, 2025, Kevin Wright (a purported adviser at HB Wealth) to an investor: "We are preparing for QAI's official launch on IdeaCrypto Exchange next week . . . I recommend minimizing stock market exposure for now. The crypto market presents clearer opportunities . . . "

- On or about November 7, 2025, Robin Mitchell (a purported adviser at Convergent Wealth) to an investor: "[V]aluations in the U.S. stock market are still high. The question most investors are asking is whether earnings growth can continue to support these valuations . . . More and more funds are reassessing asset allocation, looking for markets with higher efficiency, transparency, and growth potential. This is why the crypto market, especially futures, derivatives, and the IEO market, is rising."
- On or about January 20, 2026, Mark Thomas (a purported adviser at Associated Wealth) to an investor: "It's with this approach in mind that we, on one hand, participate in plans like CIL, which have a clear market cap management mechanism, while also continuing to recommend that judges consider quality IEO opportunities on platforms like ECX [Essential Crypto]. These innovative assets often provide sources of return that are less correlated with mainstream assets, especially in times when traditional markets are sluggish and capital efficiency is declining."

### C. The Defendants Touted False and Misleading SEC Filings and Other Fake Indicia to Legitimize the Scheme.

37. Defendants misled and lulled investors by touting fake indicia of the Adviser Defendants' and the Crypto Asset Trading Platform Defendants' legitimacy.

38. Each of the Crypto Asset Trading Platform Defendants registered with FinCEN, a bureau within the Treasury Department, 31 U.S.C. § 310, as an MSB. Representatives of each Adviser Defendant falsely touted this registration to investors as evidence of the legitimacy of the Crypto Asset Trading Platform Defendant to which the Adviser Defendant directed investors.

39. In addition, TBAA filed a Form ID with the SEC on July 17, 2024, and a Form D on July 22, 2024. Form ID is an application for access to SEC's EDGAR filing system and must be submitted by companies and individuals seeking to file on EDGAR. If the Form ID application is granted, EDGAR assigns the filer an account designated by a unique number known as a Central Index Key or "CIK." WeChat representatives pointed their investors to TBAA's CIK and Form D as evidence of TBAA's legitimacy and that it was regulated by the SEC. For example, a WeChat representative wrote to one investor, "I want to assure you that TBAA takes compliance seriously. The company operates in strict accordance with U.S. federal securities laws and is registered with the U.S. Securities and Exchange Commission (SEC) under the identifier CIK: 0002030953. This registration ensures that all of TBAA's operations are closely monitored by the SEC." That was untrue. Registering for and obtaining access to EDGAR is ministerial in nature; it did not mean that TBAA's operations were closely monitored by the SEC. In addition, the CIK number was listed on a fake SEC "certificate" sent to investors. The certificate was entirely made up, purported to show that TBAA was registered with the SEC and listed the CIK number, and was not issued by the SEC as it implied. Some WeChat/TBAA investors were sent this fake "certificate" with the claim that it showed that TBAA was registered with the SEC. Some investors were also sent similar fake certificates for two other entities used in the scheme, Convergent Wealth and Essential Crypto.

40. Convergent Wealth and Essential Crypto also filed Forms ADV with the SEC seeking to claim status as an ERA. The SEC regulates investment advisers, primarily under the Advisers Act and the rules adopted under that statute. One of the central elements of the regulatory framework is the requirement that an "investment adviser" under the Advisers Act register with the Commission, unless exempt or prohibited from registration. Generally, only larger advisers that have $100 million or more of regulatory assets under management, or that provide advice to

investment company clients, are permitted to register with the Commission. Smaller advisers register under state law with state securities authorities.

41. Form ADV is the form used by investment advisers to register with the Commission and with state securities authorities. It consists of two parts, both of which are required to be filed with the Commission, and both of which are publicly available once filed: Form ADV Part 1 and Form ADV Part 2.

42. ERAs are a category of investment advisers who would otherwise be required to register with the Commission under the Advisers Act but for the specific exemptions outlined in Section 203 of the Advisers Act. ERAs include advisers to private funds with less than $150 million in assets under management in the United States. The registration exemption for such private fund advisers is Section 203(m) of the Advisers Act and Rule 203(m)-1 thereunder.

43. ERAs, while exempt from registration, are still required to file certain items in Form ADV Part 1. ERAs do not complete Part 2. Part 1 asks for information about, among other things, an adviser's business, amount of assets under management, ownership, and clients.

44. Form ADV is filed electronically with the Commission through the Investment Adviser Registration Depository ("IARD"), a secure Internet-based filing system that collects and maintains the registration, reporting, and disclosure information for investment advisers. The Financial Industry Regulatory Authority ("FINRA"), under contract with the Commission, is the developer and operator of the IARD system. Once filed, the Form ADV is available to the public through the Commission's Investment Adviser Public Disclosure database, located at https://adviserinfo.sec.gov.

45. Convergent Wealth and Essential Crypto touted their Form ADV filings as "regulatory approval" by the SEC. That was untrue. ERAs must file a Form ADV with the

Commission, but Forms ADV are not subject to any sort of formal review before they are published; rather, they are published upon acceptance by FINRA via IAPD. Their filing and publication do not constitute "regulatory approval" of anything by the SEC.

46. On or about December 18, 2025, a representative of Associated Wealth told investors that Essential Crypto had "received regulatory approval from the SEC[,]" provided investors with Essential Crypto's CRD number, and said, "investors can visit the SEC's official website and search for 'Essential Crypto Exchange' or input the CRD number '338998' to access the official filing information and related documents." The Associated Wealth representative then provided a screen shot showing investors how to search for Essential Crypto and find the Form ADV on the SEC's Investment Adviser Public Disclosure web site.

47. In addition to the false statements about the import of the Forms ADV, the forms filed with the SEC, and touted to investors, by Convergent Wealth and Essential Crypto were false and misleading because they purported to report the entities as ERAs, when in fact the entities were sham fronts used to defraud clients and investors. Among other false statements in the Forms ADV, the respective forms contained claims that Convergent Wealth and Essential Crypto were ERAs because they acted solely as advisers to private funds, despite the fact that several of their customers, all individual retail investors, received investment advice from representatives of Convergent Wealth and representatives of Associated Wealth, the Adviser Defendant paired with Essential Crypto.

48. In addition, Convergent Wealth did not even list a private fund on its Form ADV and Essential Crypto listed a seemingly nonexistent private fund with the same name, Essential Crypto Exchange. The forms also listed individuals as regulatory contacts for the firms (Wilsom Ramos Castillo for Convergent Wealth and Christopher Buckingham for Essential Crypto) who are not real people and/or are not people affiliated with the respective firms. Finally, the phone numbers and

office addresses listed on their respective Forms ADV were either fictitious or not related to the firm.

**D. The Four Adviser Defendant / Crypto Asset Trading Platform Defendant Pairings and Segments Were Part of an Extensive, Interconnected Scheme.**

49. The Four Adviser Defendant / Crypto Asset Trading Platform Defendant pairings used nearly identical tactics to lure and obtain investments from investors. The pairings followed a temporal script, each Adviser Defendant and its paired Crypto Asset Trading Platform Defendant operating for approximately six months then phasing operations out. In addition, the Adviser Defendants used nearly identical language on their web pages. In one instance, a successor Adviser Defendant, HB Wealth, left the name of its predecessor, WeChat, on one of its web pages. Also, the same contact information was used to register domains for websites of multiple Adviser Defendants and Crypto Asset Trading Platform Defendants.

50. During each of the four segments of the scheme the Defendants touted identical competitions between two fake human advisers, engaging and encouraging investors to vote daily for their favored adviser, with the winning adviser chosen to manage a purported $10 billion fund. The contest ran the same four separate times. Likewise, every Adviser Defendant represented to investors and on their website that they were paid through the identical advisory fee structure based on client profits, and that the Adviser Defendant would reinvest a portion of those payments in charity and in the $10 billion fund to benefit clients.

51. The respective Adviser Defendant/ Crypto Asset Trading Platform Defendant pairings also used similar routes for funneling investor money, aggregating it at common end points. As reflected in the below chart, investor funds travelled from an investor-controlled crypto address to an address affiliated with one of the Crypto Asset Trading Platform Defendants, identified in the chart as an "accumulation address." The latter address was provided by the paired

Adviser Defendant. Each Adviser Defendant / Crypto Asset Trading Platform Defendant pairing aggregated investor funds in one of four accumulation addresses on the Ethereum network. The aggregated funds were then transferred to the Tron network, via cross-chain bridges, identified in the graph below. The below graph summarizes a cross-section of the route travelled by investor funds, including from the Ethereum based accumulation addresses on the left, funneled through a series of consolidation and intermediary addresses, across what was a coordinated network, transiting through cross-chain bridges, to common end points on the right, on the Tron network.




52. Cumulatively, investors sent approximately $35,542,323 in crypto asset deposits to crypto asset accumulation addresses associated with the four Adviser Defendant / Crypto Asset Trading Platform Defendant pairings, plus an additional $1,903,477 in fiat currency, for a total of $37,445,800 received from investors at addresses controlled by the Defendants. The TBAA accumulation address received at least $7,318,922 in investors' funds; the IdeaCrypto accumulation

address received at least $13,641,159 in investor funds; the RealSimple accumulation address received at least $10,358,378 in investor funds; and the Essential Crypto accumulation address received at least $4,223,863 in investor funds.

53. The four accumulation addresses, which played a central role in this scheme, and received investor funds, which were ultimately funneled through the network depicted above, are as follows:

(a) 0xa0b895ca09478c8f26b4a3ee62e5fa8d0d3e8e39 (TBAA)

(b) 0xb7cde5668cb70f237e8ba691b8c6e043b3754d5e (RealSimple)

(c) 0xd65e284d13742f990427a329f5427fbdfcb48234 (IdeaCrypto)

(d) 0xdc9062a291caccb18e9183ab3c645308da288f52 (Essential Crypto)

54. The Adviser Defendants, all following a similar pattern, directed investors to send their money to the Crypto Asset Trading Platform Defendants in crypto assets, including ether ("ETH"), tether ("USDT"), and USD Coin ("USDC"). The fund transfers followed a similar pattern across each segment of the scheme as investors were directed to: (a) deposit U.S. dollars to the investor's account at a well-known, U.S.-based crypto asset trading platform; (b) convert those funds to crypto assets and transfer them to a non-custodial crypto asset wallet, also under the investor's control; and (c) transfer the crypto assets from the investor's non-custodial crypto asset wallet to the accumulation address provided to the investor by the Adviser Defendant. The investor was then led to believe that the funds then were transferred to the investor's account with the paired Crypto Asset Trading Platform Defendant. Investors were directed to download an app for the Crypto Asset Trading Platform Defendant. The app appeared realistic and purported to show the investor's account, including money the investor had transferred to the platform and crypto assets investors were led to believe they had bought and sold on the platform.

55. Investors were advised by the Adviser Defendants that they were able to use the funds in their account to invest in crypto assets with the paired Crypto Asset Trading Platform Defendant. Those representations were false. The Defendants quickly dispersed investor funds well beyond the investors' reach.

56. The Adviser Defendants used a variety of tactics and techniques to get as much money as possible from investors. They pitched IEOs of the various crypto assets as exclusive opportunities available only to a select group of clients and investors. The opportunities did not actually exist. They provided false information leading investors to believe their investments had increased dramatically in value over a short period of time, which investors were led to believe was happening on the app for the platform through made up increases in the value of the crypto assets they were led to believe they had purchased. When investors sought to withdraw some of these illusory profits, they were told it required payment of a separate fee, calculated as a percentage of their supposed profits, and investors were threatened and pressured if they did not pay it. When investors asked to have the fee withdrawn from their profits, or even their original investment, they were told they could not and that the only way to pay the fee was in crypto assets to a separate address from the one they used initially to fund their account.

57. Investor A, a client of the HB Wealth/IdeaCrypto pairing, lost nearly $500,000 to these tactics, including funds borrowed from a 401(k) retirement account, as well as from a son and neighbor. Investor B, a client of the Convergent Wealth/RealSimple pairing, lost approximately $850,000, including borrowed money from family members and liquidating a 401(k) retirement account. Investor C, a client of the Associated Wealth/Essential Crypto pairing, lost close to $1.6 million dollars, including the investor's house and IRA.

58. Eventually, investors were unable to withdraw any money at all from their accounts purportedly held by a Crypto Asset Trading Platform Defendant; the websites for the Adviser

Defendant and paired Crypto Asset Trading Platform Defendant went down; and the WhatsApp chats went silent. The supposed trading did not occur and no crypto assets underlying the purported IEOs existed. The investor money simply disappeared into a multi-layered maze.

59. Defendants used communications transmitted over the internet, via interstate commerce, to communicate with investors, and investors with them. Defendants used, and induced investors to use, communications in interstate commerce to transfer and receive investor money. Defendants' scheme included encouraging and inducing investors to purchase and sell stocks on various national securities exchanges.

## FIRST CLAIM FOR RELIEF

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder – All Defendants)**

60. Paragraphs 1 through 59 above are re-alleged and incorporated by reference as if fully set forth herein.

61. By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

62. By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R §240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF

**(Violations of Sections 206(1) and 206(2) of the Advisers Act – Defendants Advisor WeChat Capital, HB Wealth Advisors, Convergent Wealth Advisors Inc., and Associated Wealth Advisors Ltd)**

63. Paragraphs 1 through 59 above are re-alleged and incorporated by reference as if fully set forth herein.

64. At all relevant times, Defendants Advisor WeChat Capital, HB Wealth Advisors, Convergent Wealth Advisors Inc., and Associated Wealth Advisors Ltd were investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

65. Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1), 80b-6(2)] provide that it is unlawful for an investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: (1) to employ any device, scheme, or artifice to defraud a client or prospective client; or (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client.

66. By reason of the conduct described above, Defendants Advisor WeChat Capital, HB Wealth Advisors, Convergent Wealth Advisors Inc., and Associated Wealth Advisors LTD violated and, unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act.

## THIRD CLAIM FOR RELIEF

**(Violations of Section 207 of the Advisers Act – Defendants Convergent Wealth Advisors Inc. and Essential Crypto Exchange)**

67. Paragraphs 1 through 59 above are re-alleged and incorporated by reference as if fully set forth herein.

68. As set forth above, Defendants Convergent Wealth Advisors Inc. and Essential Crypto Exchange, by use of the mail and the means and instruments of interstate commerce,

directly and indirectly, willfully made untrue statements of material fact in a report filed with the SEC under the Advisers Act.

69. By reason of the conduct described above, Defendants Convergent Wealth Advisors Inc. and Essential Crypto Exchange have violated, and unless enjoined will continue to violate, Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court enter a Final Judgment:

**I.**

Permanently restraining and enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

Permanently restraining and enjoining Advisor Defendants, Advisor WeChat Capital, HB Wealth Advisors, Convergent Wealth Advisors Inc., and Associated Wealth Advisors LTD from violating Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)]; and

Permanently restraining and enjoining Defendants Convergent Wealth Advisors Inc. and Essential Crypto Exchange from violating Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

**II.**

Ordering Defendants to pay appropriate civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] (as to all Defendants) and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] (as to Defendants Advisor WeChat Capital, HB Wealth Advisors, Convergent Wealth Advisors Inc., Associated Wealth Advisors LTD, and Essential Crypto Exchange).

**III.**

Ordering Defendants to disgorge their ill-gotten gains, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(3), (5) and (7)], plus prejudgment interest.

**IV.**

Permanently restraining and enjoining the Adviser Defendants, Advisor WeChat Capital, HB Wealth Advisors, Convergent Wealth Advisors Inc., and Associated Wealth Advisors LTD, from, directly or indirectly, acting as or being associated with any investment adviser. For purposes of this paragraph: a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser.

**V.**

Permanently restraining and enjoining Defendants Convergent Wealth Advisors Inc. and Essential Crypto Exchange and their officers, agents, servants, employees, and attorneys, from filing a Form ADV as an ERA.

**VI.**

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and,

**VII.**

Awarding any other relief that the Court deems just and proper.

## **JURY DEMAND**

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

//s// Martin F. Healey
Martin F. Healey (Mass Bar No. 227550)
Jonathan Allen
33 Arch Street, 23rd Floor
Boston, Massachusetts 02110
Telephone: (617) 573-8952 (Healey direct)
Facsimile: (617) 573-4590
E-mail: healeym@sec.gov